Argued and submitted October 16, 1985, reversed and remanded February 5, 1986

In the Matter of S. C. G., a child.

STATE ex rel JUVENILE DEPARTMENT
OF WASHINGTON COUNTY,
*Respondent,*

*v.*

S. C. G.,
*Appellant.*

(J12-1035; CA A34850)

713 P2d 689

Timothy M. Bowman, Hillsboro, argued the cause and filed the brief for appellant.

Douglas F. Zier, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Buttler, Presiding Judge, Joseph, Chief Judge, and Rossman, Judge.

ROSSMAN, J.

## ROSSMAN, J.

In this juvenile court proceeding, a 13-year-old child appeals the finding that he was within the jurisdiction of the court for having committed Class A and Class C felonies involving sexual misconduct with another minor child. He contends that the court, in an omnibus hearing, erred in finding that statements which he made to a Children's Services Division (CSD) worker and a police officer were voluntary and admissible. We review *de novo* and reverse.

Incriminating admissions induced by a direct or implied promise are involuntary and inadmissible. *State v. Mendacino*, 288 Or 231, 603 P2d 1376 (1979); *State v. Ely*, 237 Or 329, 390 P2d 348 (1964); *State v. Capwell*, 64 Or App 710, 669 P2d 808 (1983). The issue here is whether statements made to the child by the CSD worker and police officer impliedly promised him leniency and whether those statements or promises induced him to make the admissions.[1]

The child was questioned at his home on two consecutive days. On the first day, in his mother's presence, the child denied involvement in the alleged misconduct but expressed fear that he, like other of his siblings, would be removed from his home. He was assured that that was not being considered and that, if the allegations made against him were true, there was community treatment available.

The next day, with the mother's permission, the CSD worker returned with a police officer to question the child while he was alone. The CSD worker testified:

"Q. Did you say anything about his previous remarks?

"A. I believe I said that I know he had denied it the day previous; that I had some feeling that he was afraid of the consequences if he told the truth.

"I told him that basically we were not looking at taking him away and that we had just gotten done talking to [the victim] and would like him, as a first step, to tell us what happened in his own words.

"Q. And so at that time, you felt he was probably still

---

[1] Although not specially assigned as error, the child's brief refers to *Miranda* warnings. The state devotes a substantial portion of its brief to that subject. We view this case as presenting fundamentally a voluntariness problem.

concerned about being taken out of the home and you told him that you were not considering that and that if that was a factor in his denial the previous day, that he should be assured that wasn't going to happen; is that a fair characterization?

"A. That's right.

"Q. Did he say anything in response to that statement?

"* * * * *

"A. We reassured him that we were not going to take him away regardless of what he said that day and then he started to talk about his conduct * * *."

The police officer testified next:

"A. Yes. I introduced myself. * * * I advised him that I was a police officer and * * * [the child] somewhat denied the allegations * * *.

"* * * I explained to him that we were attempting to identify a problem; that a girl had told us that he had abused her and that for us to be able to get him into a treatment program and to insure that he did not grow up to be a person that enjoys only a young child in a sexual relationship, that we had to sit down and talk about it.

"I don't recall that we even had a conversation about custody because it wasn't even being considered. I did explain to him, however, the procedure that we use; that if he did what he was accused of doing, that he would be referred to the Washington County Juvenile Department for evaluation and for treatment."

At no time during the conversations was the child advised that he did not have to speak, that what he said could be used against him in court, that he was entitled to a lawyer if he wanted one or that he was risking the loss of his liberty—either by possible placement in detention or by eventual institutionalization. The real thrust of what the investigators did say to the child is that he would not be removed from his home but would be given treatment if he would only admit the accusations. That was in response to the fear that the child had expressed from the very beginning of the questioning. It was not until the assurances were given to the child that he was willing to implicate himself. The investigators' assurances—together with the descriptions of the community treatment programs—were, if not direct, at least implied promises

of leniency, which we find induced the child to make the incriminating statements.

On *de novo* review, we hold that the child's admissions were involuntary and inadmissible.

Reversed and remanded for a new jurisdictional hearing.