Argued and submitted May 31, reversed and remanded July 25, 2001

# STATE OF OREGON,
*Appellant,*

*v.*

# KYLE E. ANDERSON,
*Respondent.*

## 99CR0389MS; A110135

28 P3d 662

Katherine H. Waldo, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Ingrid A. MacFarlane, Deputy Public Defender, argued the cause for respondent. With her on the brief was David E. Groom, Public Defender.

Before Landau, Presiding Judge, and Brewer, Judge, and Ceniceros, Senior Judge.

BREWER, J.

## BREWER, J.

The state appeals from an order suppressing statements defendant made to the police before his arrest and prosecution for seven felony sex offenses.[1] Defendant was 15 years old at the time the crimes were allegedly committed, and he was prosecuted as an adult under ORS 137.700(2)(a). The state argues that the trial court erred in treating defendant's request to speak to his father in the course of police questioning as an invocation of his privilege against self-incrimination. We reverse and remand.

On March 12, 1999, defendant's four-year-old step-sister reported that defendant had sexually abused her while babysitting her the previous evening. The incident was reported to the police. Defendant's parents consented to a police interview of defendant at the police station. Several days later, two police officers went to defendant's school. They initially met with defendant in the vice principal's office, where they told him that they wanted to discuss a "sexual touching" issue with him at the police station. Defendant agreed to accompany the officers to the station. Defendant retrieved his coat and backpack from his classroom while the officers waited in the hall. During the trip to the police station, the officers discussed music and computers with him and also played a recording by one of defendant's favorite musicians.

At the police station, the officers took defendant to an interview room and advised him of his *Miranda* rights. Defendant asked "if these statements could be used to help him also." Detective Catt explained that the statements could be used both to help defendant and against him, depending on what he said. Defendant said that he understood, and that he wanted to talk to the police to "get it cleared up." The officers searched defendant's coat and backpack for weapons, found none, and then placed the coat and backpack "separate from" defendant. Catt told defendant

---

[1] Defendant was charged with six counts of sexual penetration with a foreign object, ORS 163.411, and one count of sexual abuse in the first degree, ORS 163.427.

about the allegations, then discussed defendant's family circumstances, including his mother's death from cancer, personal difficulties facing his sister, and his difficulties with his stepmother.

Catt then asked defendant if he had touched his stepsister. Defendant said that it was possible but that he did not remember. He said that he did not think that she was the kind of child to make things up to get other people into trouble but that she might have been confused by something she saw in a movie. After Catt discussed various theories for the child's disclosure, defendant admitted touching her "in a sexual manner." According to Catt, just before defendant made that admission, "it was obvious that he was kind of building up courage to say something." Catt recalled that just after defendant disclosed touching the child, "he asked if he could call his father." According to Catt, Officer Sweet, who also was present during the interview, "said in essence that if he could finish that question, if he wanted to make a call, yes." Sweet described the circumstances surrounding defendant's request as follows:

> "And he asked me if he was going to get to call his dad. And I said yes, that he was. And I felt that we were probably pretty close to being finished, and I asked him if it would be okay if we went ahead and finished up and then he could certainly go in and call his dad or we would call him for him. And he said that would be fine * * * so we continued with questioning."

Defendant then described sexual contact with his stepsister in greater detail. After the questioning was completed, Catt called defendant's father to the station. Defendant and his father spoke privately for several minutes. Defendant's father then told the officers that defendant had denied the allegations, claiming that he had just told the police what they wanted to hear. Defendant's father testified that defendant was crying and emotionally distraught. Catt then spoke further to defendant without his father present. According to Catt, defendant said that he was "not ready" to tell his father about what had happened.

The interview lasted for more than two hours. Following the interview, defendant was arrested and charged

with the felonies previously mentioned. Defendant's father testified that he never would have allowed the police to interview defendant without an attorney present if he had known that defendant could be tried as an adult for the alleged crimes.

Defendant filed a pretrial motion to suppress the statements he made to the police. Defendant made a three-part argument: (1) that his request to call his father constituted an invocation of his *Miranda* rights; (2) that he did not voluntarily waive his *Miranda* rights; and (3) that his statements to the police were involuntary. After hearing the evidence and argument, the trial court made findings on the record, the most pertinent of which follow:

"[F]irst, I make the ruling that both officers are credible and were good witnesses.

"This is fundamentally going to boil down to the issue about what happens when [defendant] asked to speak to his father.

"* * * * *

"* * * Defendant's father was aware Defendant would be questioned by police. Neither Defendant's father nor his step-mother requested the presence of an attorney for Defendant while Defendant was being questioned by the police. And neither requested to be present during Defendant's interview on March 29, '99.

"* * * * *

"* * * Defendant agreed to go with the officers and did not request to contact anyone prior to the officers driving him to the police station. The Defendant was not restrained in any manner during the drive or while at the police station.

"* * * [A]t the police station the police officers asked Defendant if he understood why they needed to speak with him. Defendant stated that he understood the reason. Defendant stated he wanted to get this matter cleared up.

"Defendant was advised of his *Miranda* rights. Defendant indicated he understood his rights and that he wanted to know if anything he said could be used against him or to clear him of the allegations.

"* * * the police officers, in my estimation, treated [defendant] well.

"* * * [Defendant] wanted to answer the officers' questions. During the course of the interview [defendant] asked the officer, am I going to get [to] call my father?

"Now I note we're talking about a 15-year old boy here. And I find for the record he has had no prior contacts with the law.

"And I believe—and I have given this a lot of thought— I don't think the police officers did anything wrong. * * *

"But I think the State of the law is, when you are talking about a person of this maturity, although he may be—he may have good intelligence for a person his age, I think when he says he wants to speak to his parent, I don't think we can go beyond that. I think we have to give him the opportunity to speak to his parent. And that is what I'm finding.

"Now it can certainly be said that he willingly continued the interview with the officers. But I think it is like when in a situation when you invoke your right to speak to counsel, once a child of 15 has done that, they need to be given that opportunity and you can't bypass it.

"Up until that time the Defendant's interview and the confession were the product [of] an essentially free, unconstrained and an informed choice by Defendant. His confession was knowingly and intelligently and voluntarily given up until that point. But I don't think that we could bypass the part where he wanted and asked to speak to his parent, given that he was 15 at the time that this happened, no prior contact with the law.

"* * * * *

"I think there are factors in the record that would suggest that [defendant] is a pleaser, wants to cooperate. But, on the other hand, I believe that he is intelligent for his age. And I believe up until the time that he asked to speak to his parent that the statement was freely and voluntarily given. At that point he should have been given the opportunity, and I so find."

The court incorporated its findings into a written order that suppressed "all of defendant's statements made by defendant

after defendant requested to call his father." The court denied the balance of defendant's motion to suppress. The state appeals from the suppression order.

■　　On appeal, the state argues that the trial court erroneously held that, after *Miranda* warnings are given to a child, if the child asks to speak to a parent, police must immediately cease questioning.[2] According to the state, automatic suppression of statements made after such a request is not constitutionally required. The state also argues that defendant's question about speaking with his father did not transform otherwise voluntary statements into coerced statements under the totality of the circumstances. In response, defendant asserts that the trial court's order should be affirmed because (1) defendant's request to speak with his father was an invocation of his *Miranda* rights that was not honored; (2) defendant did not validly waive his *Miranda* rights; and (3) defendant's statements were not voluntary.

■　　At the outset we consider the substance of the trial court's decision. The state characterizes that decision as endorsing a *per se* rule of suppression for statements made during police questioning after a child has asked to talk to a parent. Defendant views the court's decision as encompassing that point, and more still. He contends that, "[t]here is an inference in the court's remarks that defendant's participation in the interview before the request to call his father was a *Miranda* waiver, and after the request to call his father any waiver was either not proved or was revoked." He also

---

[2] *Miranda* warnings are required when a defendant is questioned in a setting that should be recognized as "compelling." *State v. Magee*, 304 Or 261, 265, 744 P2d 250 (1987); *State v. Larson*, 141 Or App 186, 195, 917 P2d 519, *rev den* 324 Or 229 (1996). The state asserts that

> "[t]he only question before this court in this appeal is whether defendant's question to police, part way through his confession, about whether he could call his father should have been treated as the functional equivalent of an invocation of a right to counsel or somehow a revocation of the previous waiver of the right to remain silent."

The state concedes that "defendant was in custody or compelling circumstances at the time police questioned him, such that *Miranda*-type warnings were required." Because the state does not assign error to that foundation of the trial court's ruling, we assume without deciding that it was correct. *See State ex rel Juv. Dept. v. Thai / Schmolling*, 138 Or App 354, 358, 908 P2d 844 (1995) (assuming without deciding that *Miranda* warnings were required because the parties agreed that the setting was "custodial" when police questioned youth).

asserts that, "[t]he inference in the court's remarks is that after defendant requested to speak with his father and that request was denied, defendant's statements were not voluntary."

We agree that the trial court concluded that defendant's request required the police to cease questioning him. The court likened defendant's request to a "situation when you invoke your right to speak to counsel, once a child of 15 has done that, they need to be given that opportunity, and you can't bypass it." The court also expressly determined that, up to the point of the request, defendant's statements were voluntary. It is thus apparent that the court believed that a bright-line rule prevented further police questioning after defendant asked about speaking to his father. That conclusion, however, is at odds with settled precedent.

In *State ex rel Juv. Dept. v. Gibson*, 79 Or App 154, 718 P2d 759 (1986), the central issue was whether a youth, by asking to speak to her mother during custodial interrogation, invoked her Fifth Amendment right against compelled self-incrimination. In rejecting the youth's contention that her request amounted to an invocation, we relied on the reasoning of two federal decisions. The first was *Fare v. Michael C.*, 442 US 707, 99 S Ct 2560, 61 L Ed 2d 197 (1979), in which the Supreme Court held that a juvenile's request during interrogation to speak to a probation officer did not constitute an invocation of his Fifth Amendment rights. The court stressed differences between an accused's relationship with his probation officer and with an attorney, including the probation officer's lack of legal and advocacy training, the absence of a communicative privilege between the accused and a probation officer, and the inherent loyalty of the probation officer to his or her employer, the state. *Id.* at 722. The court declined to adopt a *per se* rule of suppression for statements made after a youth's request to speak to a probation officer and also held that there was nothing inherent in the youth's request under the facts before it indicating that he wished to remain silent. *Id.* at 723-24.

The second case that we found instructive was *United States ex rel Riley v. Franzen*, 653 F2d 1153 (7th Cir), *cert den* 454 US 1067 (1981), in which the court held that a

16-year-old juvenile's request during custodial interrogation to speak to his father was not a *per se* invocation of his Fifth Amendment right. The Seventh Circuit noted that, like the probation officer in *Fare*, the juvenile's father was not trained in the law, nor was he a skilled advocate. The court also found no evidence of a parent-child privilege of confidentiality under the relevant state law. Although the court acknowledged that, unlike the probation officer in *Fare*, the youth's father was not an employee of the state, the court concluded that the weight of the differences between the father's parental role and the role of an attorney made the request in *Riley* functionally indistinguishable from the one at issue in *Fare*. 653 F2d at 1160.

In light of those cases, we were

"constrained to conclude that the juvenile's request to speak to her mother was neither an invocation of her right to silence nor of her right to counsel. There was nothing inherent in her request that indicated that she did not want to speak to [the officer]." *Gibson*, 79 Or App at 163.

We also concluded that the youth's request

"was not an invocation *per se* of her right to counsel. Her mother simply was unable to fill the unique position that a lawyer fills in protecting an accused's rights that the court in *Fare* stated is so critical in its *Miranda* decision. There is no evidence that her mother was either trained in the law or a skilled advocate. Furthermore, there is no parent-child privilege in Oregon which could have protected the juvenile's statements to her mother. Certainly, the parent-child relationship is significantly different from that of a juvenile and a probation officer. Parents owe no duty to the state to report their children's wrongdoing, and in most cases they would have their children's best interests at heart. However, it was not the presence of a bond of trust between the juvenile and the person with whom he requested to speak that was critical in *Fare*; it was the lawyer's unique ability to protect the juvenile's interest. * * *

"* * * * *

"It follows that the close relationship between parent and child is not of itself a sufficient basis for extending the

*per se* rule of *Miranda* to a juvenile's request to have a parent present or to talk to a parent. We conclude that the juvenile's request to speak to her mother was not an invocation of her Fifth Amendment right." *Id.* at 163-64.

Defendant acknowledges that this case is indistinguishable from *Gibson* on its facts, but he urges us to reconsider and overrule *Gibson* based on what he argues are its faulty underpinnings in *Fare* and *Riley*. Apart from exhortation, defendant presents no persuasive argument that would justify our revisiting *Gibson*. In *Gibson*, we considered the case on which he relies primarily, *People v. Burton*, 6 Cal 3d 375, 491 P2d 793 (1971), and concluded that it was of "doubtful validity" in light of *Fare*. *Gibson*, 79 Or App at 159. Defendant points to no intervening authority that undercuts the reasoning of *Fare* and *Riley*. If anything, our decisions since *Gibson* have reinforced our conclusion there. *See, e.g., State v. Rivas*, 99 Or App 23, 30, 781 P2d 364 (1989) (declining to adopt "interested adult" rule that would preclude a juvenile's waiver of self-incrimination rights without first being provided the opportunity to consult with an informed and interested adult). Defendant's request to speak to his father was not an invocation of his Fifth Amendment right to silence.

Unlike the youth in *Gibson*, defendant also relies on Article I, section 12, of the Oregon Constitution, in support of his invocation argument. However, defendant makes no separate argument under the Oregon Constitution, so we decline to consider the state constitutional issue. *See State v. Mendez*, 308 Or 9, 19, 774 P2d 1082 (1989) (court declined to address undeveloped state constitutional argument).

We turn to the questions of whether defendant voluntarily waived his *Miranda* rights and whether his statements made after he asked to speak to his father were voluntary. The analysis for each issue is the same. *State v. Foster*, 288 Or 649, 655, 607 P2d 173 (1980); *State v. McCoy*, 165 Or App 499, 506, 998 P2d 709 (2000). The court "must inquire into the totality of the circumstances surrounding the * * * police interrogations to determine whether the defendant in fact knowingly and voluntarily decided to forego his rights to remain silent and to have the assistance of counsel." *Foster*, 288 Or at 655. The totality of the circumstances

includes, but is not limited to, defendant's request to speak with his father. *Gibson*, 79 Or App at 165. The state argues that the trial court decided those issues adversely to defendant and would not have suppressed defendant's statements but for its mistaken conclusion that his request to speak to his father was an invocation. Therefore, the state reasons, this court is free to determine that defendant waived his right to silence and that his statements were voluntary. We disagree.

■  The court made no dispositive findings with respect to the waiver and voluntariness issues. It is evident that the court was concerned about the defendant's age, the fact that defendant was something of a "pleaser," and that he had no experience with the law before this case. However, it did not appear to analyze those factors and other relevant factors, including defendant's request to talk to his father, under the totality of circumstances test.

Once again, *Gibson* is instructive. There, despite concluding that the youth's request to speak to her mother did not invoke her Fifth Amendment right, we affirmed the juvenile court's determination that the youth did not waive that right. We noted that "factors to consider include the juvenile's age, experience, education, background, and intelligence and whether the juvenile has the capacity to understand the *Miranda* warnings, the nature of the Fifth Amendment rights and the consequences of waiving them." *Gibson*, 79 Or App at 164. We agreed with the juvenile court that, under the totality of the circumstances, the youth had not waived her rights:

> "The request [to speak with her mother] indicates some uncertainty as to what she wished to do when faced with an obviously stressful situation. Based on her age, her relative inexperience with the law, the state's failure to show that she was asked whether she wished to waive her rights[,] and her request to speak to her mother, we conclude that the state did not sustain its heavy burden of proving that the juvenile waived her rights." *Id.* at 165.

■  The trial court is entitled to determine in the first instance whether defendant waived his right to silence and whether his statements were voluntary. *State v. Onuskanich,*

86 Or App 454, 460, 739 P2d 1062 (1987). Because the court appeared to adopt a *per se* rule of suppression as to statements made after defendant asked to speak to his father, it made no factual findings under the totality of circumstances test. Accordingly, we remand for findings of fact on those issues.

Reversed and remanded for further proceedings.